**MUNZENRIEDER & ASSOCIATES, INC., d/b/a United Freight Sales, Appellant,**

v.

**Robert DAIGLE and Glenn W. Broussard, Appellees.**

**No. 7702.**

Court of Civil Appeals of Texas, Beaumont.

July 10, 1975.

Terry L. Belt, Austin, for appellant.

Barry K. Bishop, Austin, for appellees.

DIES, Chief Justice.

Plaintiff below, Munzenrieder & Associates, Inc., d/b/a United Freight Sales (appellant), sought injunction against Robert Daigle and Glenn W. Broussard, defendants (appellees), to prohibit them from engaging in a competitive business. Trial was to the court without a jury who denied the injunction, from which plaintiff perfects this appeal. We affirm the trial court's judgment.

Plaintiff, a national retail chain selling furniture, sewing machines and stereo equipment, operates a store in Austin, Texas, under the name of "United Freight Sales." Both defendants worked at this outlet and signed agreements with plaintiff not to engage in a competitive business for two years after termination of employment with plaintiff in Travis, Bastrop, Hays, and Williamson counties. Within this period, defendants opened a store under the name of "Texas Furniture Outlet" at a location in Austin previously used by plaintiff.

The court filed Findings of Fact and Conclusions of law among which were the following:

"10. The only store presently being operated by Plaintiff in the state of Texas is located at 6535 North Lamar, Aus-

tin, Travis County, Texas. While employed by Plaintiff, Defendant, ROBERT DAIGLE, acted as a salesman and received training in techniques of selling sewing machines. Specifically, said Defendant was trained to damage an advertised machine so it would have a shoddy appearance; to maladjust an advertised machine so that the tension, stitch length, and material feed would appear faulty; and to represent to Plaintiff's customers that its stock was freight goods, that is, unclaimed freight, damaged freight, or freight overshipments. Said Defendant placed no orders for goods for Plaintiff, had no contact with Plaintiff's suppliers, placed no advertising, and received no training in inventory control.

"11. Plaintiff actively represents that its merchandise is freight goods, such as unclaimed freight, damaged freight, and freight overshipments. None of Plaintiff's merchandise is of such category and Plaintiff receives its merchandise from regular suppliers.

"12. Plaintiff regularly makes alluring but insincere offers to sell a particular product which Plaintiff in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the Plaintiff. Plaintiff fails to make a bona fide effort to sell the advertised product.

"13. Plaintiff regularly engages in the practice of discouraging the purchase of advertised merchandise as part of a bait scheme to sell other merchandise. Among such acts or practices which Plaintiff engages in are the following:

"(a) Plaintiff disparages by acts or words the advertised product or disparages the guarantee, in connection with it.

"(b) Plaintiff regularly shows or demonstrates an advertised product which is defective, unusable, or impractical for the purpose represented or implied in the advertisement, and in some instances, materially damages such merchandise so that it will be defective.

"(c) Plaintiff intentionally causes confusion as to the source of its merchandise and the reason for its pricing."

Defendant Daigle testified plaintiff would frequently advertise "leaders" when they didn't have the merchandise to back up the ads. That while at plaintiff's store they engaged in "bait and switch" operations. That is, they would advertise a leader sewing machine and then damage it (with a hammer) in a backroom of the plaintiff's store so it appeared faulty. This machine was advertised at about cost price. When it was demonstrated to a customer its damaged condition produced dissatisfaction, and the customer was then "switched" to another machine. Defendant Broussard was trained to tell customers the merchandise was "freight surplus, unclaimed freight or factory surplus."

Jacob Williams, employed by plaintiff at the time he testified, said during the eight months he had worked there he had sold only one "leader" and this (the sale of a leader) was really a joke. When the customer comes in to see the leader (a Singer) he generally states there is no warranty or guarantee on the Singer, no accessory kit with it, no portable case or cabinet, and that it is designed primarily to sew on just lightweight materials. While at the Waco store they would take the top off the Singer and "just messed up the inside gears so it wouldn't work properly." They really never tried to sell the Singer (leader) but, another brand. He tells customers the reason for low cost is the merchandise is "unclaimed freight." When the Domestic machines (the ones they push) come in he uncrates them, removes the factory warranty, and replaces it with plaintiff's warranty.

Daigle was shown by plaintiff's manager how to damage a leader. First they threw

away the accessory kit and the guarantee card, and then, with a claw hammer, damaged the outside of the machine "to make it appear as freight damaged." The "feed dog" was "adjusted" so that "one feed dog would move it through at a different pace than the other . . . causing the stitch not to be straight. . . ." The "thread take-up lever" was beat "where it would rub and when it goes up and down very rapidly, it would make a noise and no one was interested at all in a sewing machine that did not operate quietly. . . ." An officer of plaintiff told him their name " 'Freight Sales is our gimmick . . . that we use to sell customers and that it's a white lie.' "

Broussard's bait and switch training was essentially the same as Daigle's. To get the customer away from the leader he was told it would not sew on heavyweight materials. It carried no warranty. "[M]ake it look like it really wouldn't be exactly a sound purchase."

While a vice president of plaintiff company denied "bait and switch" training or tactics, this testimony certainly supports the court's findings. And, of course, it is so well-settled as to need no recitation of authority, when these findings are so supported they are binding on this court.

Defendants urge that the above conduct precludes the equitable relief plaintiff seeks under the doctrine of "unclean hands." This doctrine simply stated requires those coming into a court of equity to come with "clean hands." 30 C.J.S. *Equity* § 93 (1965) at p. 1006 and cases cited therein. But this general principle of equity is not absolute, and limitations have been placed upon its application. It does not operate to repel all sinners from a court of equity. Kirkland v. Handrick, 173 S.W.2d 735 (Tex.Civ.App.—San Antonio 1943, writ ref'd w.o.m.). It is also firmly entrenched in this jurisdiction that the conduct complained of must arise directly out of the transaction in issue. Pacific Mutual Life Insur. Co. v. Westglen Park, Inc., 160 Tex. 1, 325 S.W.2d 113 (1959). The party relying upon this doctrine must show that he himself has been injured by the conduct in order to justify application of the principle, and the wrong must have been done to the party himself rather than to some third person. Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401 (1960). See also Vaughan v. Kizer, 400 S.W.2d 586 (Tex.Civ.App. —Waco 1966, writ ref'd n.r.e.) and Professional Beauty Products, Inc. v. Schmid, 497 S.W.2d 597 [Tex.Civ.App.—El Paso 1973, aff'd in part sub nom., Professional Beauty Products, Inc. v. Derington, 513 S.W.2d 236 (Tex.Civ.App.—El Paso 1974, writ ref'd n.r. e.)]. However for the reasons to be stated below we do not feel compelled to rely upon this particular contention by the defendants.

As in all cases of this nature, we are governed by the pronouncements made by the Supreme Court in Weatherford Oil Tool Company v. Campbell, 161 Tex. 310, 340 S.W.2d 950 (1960). In Weatherford, the Court enunciated the applicable test:

"[T]he test usually stated for determining the validity of the covenant as written is whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and good will of the employer. According to the Restatement [§§ 515, 516] a restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." Id., at 951.

The burden is on the former employer to show that the covenant not-to-compete is no "greater restraint than is reasonably

necessary to protect the business and good will of the employer." Carpenter v. Southern Properties, 299 S.W. 440 (Tex.Civ.App. —Dallas 1927, writ ref'd).

The trial court found that the restrictive covenant was not reasonable because "such provisions impose a greater restraint than is reasonably necessary to protect the business and good will and are not essential to the protection of the business and good will of Plaintiff," that "[t]he gross sales of Plaintiff are now substantially the same as before Texas Furniture Outlet began business and have not declined as a result of the conduct of the business of Texas Furniture Outlet" and that "Texas Furniture Outlet's store at 1006 South Lamar and Plaintiff's store at 6535 North Lamar are in substantially different trade areas." Plaintiff attacks these findings with a no evidence point of error to the effect that the trial court erred in not finding the restrictive covenant reasonable.

In attempting to uphold their burden of proof, plaintiff tried to show that the financial position of their store had declined as a result of defendants' alleged competition. But upon cross-examination, plaintiff's own witnesses stated that profits had not necessarily decreased, that gross sales had not necessarily decreased, and that some of the fluctuation in sales was somewhat in relation to the general state of the depressed economy. In response to a question as to plaintiff's financial information, plaintiff's comptroller stated that:

> "I am testifying what the financial data shows, increased cost. Since sales have held constant it seems like there wasn't really much problem in the sales' area but the cost of operating the store increased and the markup on the merchandise decreased which caused a decline in profits."

This testimony shows that the decline, if any, of plaintiff's profits was due to factors unrelated to defendants' activities. We thus fail to see how plaintiff's alleged claim of financial loss can be supported by the evidence of its own witnesses. The no evidence point is without merit and overruled.

Plaintiff also attempted to show that the defendants were using plaintiff's advertising techniques and methods which they learned and acquired from the plaintiff. But the use of plaintiff's methods which proves no threat to plaintiff are not sufficient grounds to uphold a covenant not-to-compete. Electronic Data Systems Corporation v. Kinder, 360 F.Supp. 1044 (N.D.Tex.1973) aff'd in 497 F.2d 222 (5th Cir. 1974). Further, the mere training of the defendant by the plaintiff will not, in and of itself, support the enforcement of such a restrictive covenant. Kidde Sales & Service, Inc. v. Peairson, 493 S.W.2d 326 (Tex.Civ.App.—Houston [1st Dist.] 1973, no writ). Other jurisdictions have supported this conclusion. See for example Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708 (1923).

Beyond the above summarized evidence, plaintiff made no other attempt to show that its business was being harmed in any way by the defendants alleged competitive activities. We do not think it necessary, nor would such an effort be expedient, for us to attempt a summarization or outline of the type of evidence required to show what is "reasonably necessary for the protection of an employer's business" in a case of this nature. Obviously, this would necessarily vary with the circumstances of each case. To do otherwise would, in our opinion, be to proceed beyond our judicial function. We hold that plaintiff's evidence, or lack thereof, was insufficient under the test as announced in Weatherford Oil Tool Company v. Campbell, supra, and that plaintiff failed to sustain its burden of proof in demonstrating that the covenant in question was reasonably necessary to the protection of its business and good will.

Plaintiff's evidence was weak, at best, and the trial court was justified in concluding that the covenant under question was not reasonably necessary for the protection of its business. As was said in Security Services, Inc. v. Priest, 507 S.W.2d 592 (Tex.Civ. App.—Dallas 1974, no writ):

> "We conclude that plaintiff has not established a clear right to enforcement of the covenant against competition. Such covenants are not favored by the courts because of the public policy against restraints of trade and the hardship resulting from interference with a man's means of livelihood. [citations omitted] . . . The burden is on the former employer to go beyond the terms of the employment contract and establish by satisfactory evidence both the necessity for and the reasonableness of the restraint on competition which he seeks to enforce. [citations omitted]." Id., at 594, 595.

And in concurring with the majority in Priest, Chief Justice Williams used the following language which we think pertinent to the case at bar:

> "In my opinion the judgment should be affirmed on the sole ground that plaintiff has failed to present sufficient evidence that defendant's admitted competitive endeavours have damaged plaintiff's business so as to justify the issuance of an injunction. Such being true the court did not abuse its discretion in denying equitable relief." Id., at 596.

We cannot say as a matter of law that the trial court was in error in reaching its conclusions. See Thames v. Rotary Engineering Company, 315 S.W.2d 589 (Tex.Civ. App.—El Paso 1958, writ ref'd n.r.e.) which reaffirmed the principle that a trial court has wide discretionary powers as to the enforceability of matters in equity.

Finding no error, the judgment of the trial court is in all things affirmed.